671 P.2d 940 (1983)
PEOPLE of the State of Colorado, Petitioner-Appellee, In the Interest of L.D. and D.D., Children,
And Concerning M.D. and E.D., Respondents-Appellants.
No. 82SA310.
Supreme Court of Colorado, En Banc.
October 31, 1983.
Thomas O. David, Weld County Atty., Kathy E. Dean, Lee D. Morrison, Asst. Weld County Attys., Greeley, for petitioner-appellee.
Thomas A. Houtchens, Greeley, for respondents-appellants.
Michael Stewart, Greeley, Guardian Ad Litem.
ROVIRA, Justice.
This is an appeal from the order of the trial court terminating the parental relationship between M.D. and E.D., respondents, and their children L.D. and D.D.[1] We affirm.

I.
In April 1977, the Weld County Attorney's Office filed a petition in the district court alleging that L.D., born October 3, 1970, and D.D., born November 28, 1974, were dependent or neglected. The petition stated that the children were not receiving proper care, that L.D. exhibited bruises which she claimed were inflicted by her mother, E.D., and that the children were left unsupervised for long periods of time. Based upon these allegations, the district court entered an order allowing the Weld County Department of Social Services to take the children into temporary custody and to place them in a foster home.
Social Services placed L.D. in the Glover Receiving Home for approximately two months. In June 1977, she was placed in a *941 foster home where she remained until November 1978. At that time, the foster parents, no longer able to cope with her behavioral problems, requested that she be removed. L.D. was then placed with Mr. and Mrs. W., who have cared for her since.
D.D. returned to his parents shortly after the temporary order was signed in April 1977, but in August 1977, Social Services placed him in the same foster home as his sister. He remained in that home until November 1978, at which time he also was placed with Mr. and Mrs. W.
In December 1977, the county attorney's office filed an amended petition of neglect or dependency. In addition to the allegations made in the original petition, the amended petition stated that the constant fighting of the respondents made the home environment injurious to the children's welfare. It gave notice that termination of the parent-child legal relationship was a possible remedy if the court sustained the petition.
In January 1978, upon stipulation of the parties, the court approved the first treatment plan. It authorized continued foster care for the children; required the parents to undergo a psychological evaluation to assess their capabilities to function as parents; ordered the parents to cease all physical fighting; required E.D. to demonstrate an interest in mothering her children; mandated continued counseling for the parents; ordered an evaluation of L.D. to determine the extent of her developmental disability; and advised the parents that failure to comply with the treatment plan might result in termination of their parental rights.
In June 1978, trial began on the issue of whether the children were neglected or dependent. The trial court heard extensive testimony about the respondents and their children, dating back to a time before the original petition was filed and continuing to the time of trial. In its oral findings, the trial court summarized the evidence and found that L.D. had developmental problems which were related to the care, or lack of care, available from her parents. It determined that D.D. was a child with special abilities who needed more care than his parents could provide. The court concluded that because of the respondents' marital difficulties and limited mental abilities, they were unable to care for their children. It found that both children, but particularly L.D., had not received the proper care and treatment necessary for their health and development and declared both children dependent or neglected.
At the dispositional hearing in September 1978, the court heard further testimony and received in evidence the reports of the Children's Diagnostic Center of the University of Colorado concerning L.D. and D.D.[2] The report concerning L.D. noted that she was a mentally retarded child who had achieved significant gains in social behavior during her foster home placement. It concluded that L.D. was unattached to her mother and that E.D. did not have the capacity to "parent adequately or safely." The report recommended that "at this time parental rights not be terminated since the relationship with L.D. and her father seems of benefit to her." It further recommended that L.D. remain in foster care and that visitation with E.D. and M.D. be closely monitored.
The report on D.D. stated that his functioning during intellectual testing was in the bright normal range, that he separated easily from his parents, and that he appeared to be a healthy child, developing well in all areas. It recommended that D.D. remain in foster care but found no reason "at this time" to recommend terminating parental rights. Although the report stated that M.D., the father, "at this time in D.D.'s life offers a warm relationship," neither E.D. nor M.D. was considered capable of providing adequate structure, nurturance, or supervision for either L.D. or D.D.
At the conclusion of the dispositional hearing, the court ordered a second treatment *942 plan which had already been agreed to by the parties. This plan required the respondents to seek marital counseling and to maintain a stable home environment. It provided that E.D. would continue in the mental health program known as "Stepping Stones" and would be evaluated to determine whether medication was needed to reduce her psychotic symptoms. The parents would enroll and participate in parenting classes, and M.D. would seek and maintain employment. Finally, the plan ordered continued visitation between the parents and the children. The court advised the parents again that failure to comply with the treatment plan or failure of the treatment plan to succeed might result in the termination of the parent-child legal relationship.
In April 1979, petitioner filed a motion to terminate the parent-child legal relationship along with a motion to terminate visitation. The latter motion was heard first. At this hearing, Mrs. W., the children's foster mother, testified that visitation with E.D. and M.D. had a negative effect on the children. Dr. Laurence P. Kerrigan, a clinical psychologist, testified that parental visitation was very harmful to L.D. and, while less traumatic to D.D., clearly bothered and upset D.D. as well.
Richard Schaub, a psychotherapist, testified that he had been seeing L.D. twice a week since February 1979. He considered L.D. to be an unattached child who came from an environment which inhibited her from developing in a healthy way mentally, physically, or emotionally. He was of the opinion that in order for therapy to be effective, visitation should be discontinued.
The trial court granted the motion finding that in the previous nine months, the parents had visited the children only twice and that further visitation would not be in the best interests of the children. At the request of respondents' counsel, the court authorized funds to retain an expert witness and set a date for a hearing on the motion to terminate parental rights.
In June 1979, trial began on the motion to terminate the parent-child legal relationship. After extensive testimony, the trial court found that the children had been adjudicated dependent or neglected, that respondents were unfit parents, and that respondents' emotional and mental condition was of such duration and nature as to render them unlikely, within a reasonable time, to be capable of caring for the ongoing physical and emotional needs of L.D. and D.D. However, since "it has not been established to the Court's satisfaction that an appropriate treatment plan has not been reasonably complied with, taking into consideration the parents' limitations, their natural resistance to treatment and their hostility towards the Department of Social Services," the court held that the People had not met their burden and denied the motion to terminate.
In November 1979, the petitioner again sought termination of visitation between the respondents and the children. The basis for this request was that, as a result of visitation, L.D. had experienced a severe regression in her behavior and in the progress which she had made in therapy, and D.D. had experienced emotional difficulties which necessitated psychiatric treatment. Before the court ruled, however, the parties stipulated to a temporary moratorium on further visitation. The respondents also gave notice that they contemplated filing a motion asking for the resumption of visitation under circumstances that would allow for observation of their visits by their own experts as well as by petitioner's experts.
A few months later, the court conducted another hearing on respondents' motion to resume visitation. Mrs. W. testified that as a result of the respondents' visit in September 1979, both L.D. and D.D. had suffered severe emotional and psychological distress, and L.D.'s behavior had regressed. The court ordered that no further visitation take place pending the presentation of expert testimony as to whether it would be in the children's best interest to resume visitation with their parents and what restrictions, if any, would be imposed during the visitation.
*943 In July 1980, the court again considered the request of respondents to resume visitation. Mr. Richard Schaub and Dr. Foster Cline testified on behalf of the petitioner. Schaub's testimony revealed that L.D. had been involved in therapy since March 1979 and D.D. since June 1979. He maintained that there had been significant improvement in L.D.'s behavior after therapy started but that, after a visit with the respondents in September 1979, she had regressed, and it was several months before she reached her prior level of behavioral adjustment. Schaub stated that D.D. had also made significant advances until the time of visitation with his parents. After that, it took a number of additional therapy sessions to change his behavioral patterns so that he would act in an age-appropriate manner. In conclusion, Schaub testified that further visits between respondents and the children would not be in the best interests of L.D. and D.D. In his opinion, they would not benefit from further visitation.
Dr. Cline, a child psychiatrist, testified concerning his evaluation of L.D., D.D., and the respondents. He described L.D. as a child with an I.Q. substantially below that of a normal child. In his view, she was suffering from organic or brain problems and was plagued by significant emotional problems. Dr. Cline concluded that there should be no further parental visitation with L.D. because such visitation raised frightening and upsetting memories, increased the child's uncertainty about the future, and raised a great deal of confusion and doubt. He was of the opinion that if visitation took place and L.D.'s behavior regressed as it had in the past and if, as a result the foster parents could not cope with her behavior, the only alternative might be institutionalization.
Dr. Cline also testified that because of the insecurity in D.D.'s life, his age, background, and experiences, visitation with the respondents would not be in his best interest either.
Dr. David Smart, a psychologist retained by the respondents, was called to testify on their behalf. He described L.D. as a moderately retarded child with an I.Q. of approximately 50 who was emotionally disturbed. He described D.D. as a normal child with an average I.Q. or better. In his opinion, supervised visitation between D.D. and the respondents might possibly be of benefit to D.D. Further, such visits would give him the opportunity to see how D.D. interacted with his parents. He concluded that E.D. and M.D. were mildly or moderately retarded but that they could be given training on how to limit the adverse effects of visitation on D.D.
Dr. Smart agreed with the other witnesses that L.D. should not have further visits with her parents because she was not emotionally stable and her limited intellectual ability precluded her from understanding the changes that had taken place in her life.
The trial court ruled that although there was some conflict in the testimony of the experts concerning D.D.'s ability to cope with visitation, it was not going to experiment with these children any longer. It noted that the foster parents, Mr. and Mrs. W., had provided L.D. and D.D. with a good home and that, if visitation with D.D. resulted in regression, the "placement may be torpedoed and the child will suffer far more detriment from the loss of his current placement than he would from the adverse effects of the visit alone." The court then denied the respondents' request for reinstatement of visitation.
In December 1980, approximately three and one-half years after the petition in dependency and neglect had been filed, the trial court began a hearing on the petitioner's second motion to terminate the parental rights of E.D. and M.D. Respondents objected to any further hearing on the parental termination issue on the grounds that the Department of Social Services "has obstructed and has failed to fulfill their statutory duty to reunite this family, and the Court in denying [respondents'] motion to resume the visitation is not allowing us the opportunity to make an adequate assessment of what the facts really are."
At the hearing, the trial court heard uncontradicted testimony from Dr. Cline and *944 Nancy Harris, a caseworker for the Department of Social Services, that E.D. and M.D. were unfit and that it would be detrimental to the children to have any continuing relationship with their parents. In its order, the court set out a complete history of the litigation, explaining that E.D. was a person of below-normal intelligence who was subject to schizoid and psychotic tendencies. It found that this condition would not be significantly changed or alleviated by psychotherapy. Further, it concluded that M.D. is mentally retarded, that L.D. does not have the normal coping skills of a child her age, and that D.D. is a normal child who has shown marked regression when forced to have contact with his natural parents.
The court also held that: (1) the respondents had not reasonably complied with the treatment plans, which, in any event, had not been successful in the goal of reuniting the children and their parents; (2) the conduct and condition of the respondents were unlikely to change within a reasonable time and rendered them unable or unwilling to give the children reasonable parental care; and (3) the respondents were unfit to have physical custody of L.D. and D.D. The court then ordered termination of the parent-child legal relationship and placed the children in the custody of the Department of Social Services, granting it authority to consent to their adoption.

II.
In their motion for a new trial and on appeal, respondents urge four grounds for reversal. First, they claim there was insufficient evidence to justify the trial court's denial of their motion to resume visitation at the hearing in July 1980. Second, the court erred in not distinguishing the different circumstances and conditions of each of the children and of each of the parents. Third, the court erred in its order of September 12, 1979, finding that respondents were unfit to have full-time physical custody of the children. Fourth, the treatment plans did not provide any standard by which success or failure could be measured.

A.
Respondents' first argument focuses on the trial court's decision not to resume visitation in July 1980. They allege that the court, in making this decision, ignored the reports of the University of Colorado Children's Diagnostic Center which were prepared in June and August 1978. They also claim the court failed to consider its own findings from the first termination hearing that a beneficial emotional relationship existed between the parents, particularly the father, and the children. Finally, respondents argue that the court did not appropriately weigh the self-interest of Mrs. W., the foster mother, who had indicated a desire to adopt L.D. and D.D. After carefully reviewing the record, we are satisfied that the decision of the trial court was based on evidence that was more than sufficient.
The evaluations of the University of Colorado Children's Diagnostic Center were made approximately two years before the hearing to resume visitation. Between the date of those evaluations and the trial court's order denying visitation, the court received further and substantial evidence concerning the effect of visitation on the children. In April 1979, Dr. Kerrigan conducted a psychological evaluation of L.D. and D.D. and concluded that a resumption of visitation was not in the children's best interest:
"I absolutely do not recommend that either [L.D.] or [D.D.] be placed back in the home setting. This could only result in the exacerbation of already considerable trauma. There is no question on this observer's part that even parental visiting is very harmful to [L.D.]. Though less traumatic to [D.D.], parental visitation obviously bothers him. I would recommend that for now parental visitation be terminated."
In April 1980, Dr. Cline and Mr. Schaub conducted a psychiatric evaluation of L.D. and D.D. and reached a conclusion even more alarming than that of Dr. Kerrigan:
"Numerous studies have demonstrated that children abused/neglected by parents *945 strongly and at times uncorrectibly regress when forced to maintain contact with a previously threatening situation. This is certainly the case with [L.D.] and [D.D.]. In our professional opinion, if parental visitation is continued and if parental rights are not terminated, these children will not only remain unadoptable but will probably need institutionalization in the future."
In response, the respondents offered the testimony of their own expert, Dr. Smart, but even he admitted that parental visitation had detrimental effects on L.D. He conceded that further visitation would probably cause a strong negative reaction by L.D. Dr. Smart recommended that the parents be allowed to visit D.D., but his reason for this suggestion was that he wanted to observe the visits and collect data about D.D.'s relationship with the respondents.
In determining the best interests of the children, the court properly attached more weight to the most recent reports and evaluations. It also was in a position to evaluate the credibility of the foster mother and to weigh her testimony along with that of the experts. We believe there was substantial evidence to support the trial court's order denying visitation and find no error in its decision not to experiment with the children. See People in the Interest of D.L.R., 638 P.2d 39 (Colo.1981) (placing child with parents to determine whether proper care will be provided might be detrimental and is not required).

B.
In their second argument, respondents claim that the court improperly treated the parents as one unit and the children as another unit. Instead, it should have considered each parent and child separately and taken into account their individual strengths, weaknesses, and conditions. By not analyzing the relationship of each parent to each child, they suggest, the court erred in ordering termination of all parental rights.
We find no merit in this contention. E.D. and M.D. were married at all times during these proceedings. The witnesses who testified often discussed the overall relationship between the parents and the children. At the same time, however, the witnesses and their reports repeatedly differentiated between the mental and emotional strengths and weaknesses of each of the parents and each of the children. More importantly, the trial court consistently recognized the difference between L.D. and D.D. on the one hand and the parents on the other, and made its decisions on visitation and termination based upon the best interest of each child. Any suggestion to the contrary has no support in the record.

C.
At the first parental termination trial in 1979, the trial court heard extensive testimony concerning the children and the respondents' ability to care for them. Respondents also argue in this appeal that the court erred in finding them unfit to have full-time physical custody of the children. To support this argument, they point out that the amended petition in dependency did not allege that the respondents were unfit. Furthermore, a finding of unfitness "is not justified in light of the improvement shown by the Respondents and their continued cooperation with Social Services."
At the outset, we note that the determination of respondents' unfitness was not made as further proof of the allegations contained in the amended petition. Those allegations had been proven in June 1978 when the court declared the children dependent and neglected. The finding of unfitness was made pursuant to the criteria required for termination under section 19-11-105(1)(b) and (2), C.R.S.1973 (1978 Repl. Vol. 8 and 1982 Supp.):
"(1) The court may order a termination of the parent-child legal relationship upon the finding . . .
(b) That the child is adjudicated dependent or neglected and all of the following exist:

*946 (I) That an appropriate treatment plan approved by the court has not been reasonably complied with by the parent or parents or has not been successful;
(II) That the parent is unfit;
(III) That the conduct or condition of the parent or parents is unlikely to change within a reasonable time.
(2) In determining unfitness, conduct, or condition, the court shall find that continuation of the legal relationship between parent and child is likely to result in grave risk of death or serious injury to the child or that the conduct or condition of the parent or parents renders the parent or parents unable or unwilling to give the child reasonable parental care. In making such determinations, the court shall consider, but not be limited to, the following:
(a) Emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely within a reasonable time to care for the ongoing physical, mental, and emotional needs of the child;
(b) Conduct towards the child of a physically or sexually abusive nature;
(c) History of violent behavior;
(d) A single incident of life-threatening or gravely disabling injury or disfigurement of the child;
(e) Excessive use of intoxicating liquors or controlled substances . . . which affect the ability to care and provide for the child;
(f) Neglect of the child;
(g) Long-term confinement of the parent;
(h) Injury or death of a sibling due to proven parental abuse or neglect;
(i) Reasonable efforts by child-caring agencies which have been unable to rehabilitate the parent or parents."
Utilizing these factors, the trial court properly found the respondents to be unfit based on evidence of emotional illness, mental illness, mental deficiency, neglect of the children, and evidence that reasonable efforts by the Weld County Department of Social Services and the Weld Mental Health Center had failed to rehabilitate the parents. As we stated in People in the Interest of C.A.K., 652 P.2d 603, 613 (Colo.1982),
"the credibility of witnesses, the sufficiency, probative effect and weight of the evidence, and the inferences and conclusions to be drawn therefrom are all within the province of the trial court, whose conclusions will not be disturbed on review unless so clearly erroneous as to find no support in the record."
See People in the Interest of M.S.H., 656 P.2d 1294 (Colo.1983); Gebhardt v. Gebhardt, 198 Colo. 28, 595 P.2d 1048 (1979); Adler v. Adler, 167 Colo. 145, 445 P.2d 906 (1968). We conclude that the trial court, in accordance with section 19-11-105(3), gave "primary considerations to the physical, mental, and emotional conditions and needs" of L.D. and D.D. in deciding that respondents were unfit.

D.
Respondents' final argument is that the 1978 and 1979 treatment plans did not specify, on their face, any standard by which success or failure could be measured. The parties in C.A.K., supra, raised this identical issue, and we held in that case that the standards to be applied in evaluating the results of a treatment plan are those contained in the Children's Code. If the plan improves conditions or corrects unfit parental conduct, it will be judged successful. Explicit criteria for success need not be included in the treatment plan itself. Id. at 611.
The judgment of the district court is affirmed.
NOTES
[1] This case was transferred from the court of appeals pursuant to section 13-4-109, C.R.S. 1973.
[2] The reports, dated June 27, 1978, and August 10, 1978, evaluated both the children and the parents, as well as the relationship between them.