The **PEOPLE** of the State of Colorado, Petitioner–Appellee and Cross–Appellant,

In the Interest of A.M., a Child, and Concerning A.C. and N.M., Respondents–Appellants and Cross–Appellees,

and

**L.H. and R.H., Intervenors.**

No. 10CA0522.

Colorado Court of Appeals, Div. I.

Dec. 23, 2010.

Bob D. Slough, County Attorney, Cortez, Colorado, for Petitioner–Appellee and Cross–Appellant.

James A. Shaner, Guardian Ad Litem.

Law Office of Cameron C. Secrist, P.C., Cameron C. Secrist, Cortez, Colorado, for Respondent–Appellant and Cross–Appellee A.C.

Jon Lewis Kelly, P.C., Jon L. Kelly, Dolores, Colorado, for Respondent–Appellant and Cross–Appellee N.M.

Timothy J. Eirich, Denver, Colorado, for Intervenors.

Opinion by Judge TAUBMAN.

In this dependency and neglect proceeding, A.C. (mother) and N.M. (father) appeal the judgment terminating their parental rights with respect to their child, A.M. The Montezuma County Department of Social Services (MCDSS) separately appeals the judgment terminating mother's parental rights, but it supports the judgment terminating father's parental rights. Both the child's guardian ad litem (the GAL) and the child's foster parents, L.H. and R.H., who were permitted to intervene in the dependency and neglect proceeding, support the judgment with respect to both parents. On appeal, both parents and MCDSS challenge the right of the foster parents to fully participate as parties in the termination proceedings.

We initially announced our decisions in this case on November 24, 2010. However, in response to the supreme court's decision in *People in Interest of A.J.L.,* 243 P.3d 244 (Colo.2010), we withdrew our opinions. We did so because the supreme court held that a trial court may, but need not, accord greater weight to more recent evidence in a dependency and neglect proceeding to terminate parental rights. The majority had reached a contrary conclusion in response to an argument raised by mother and MCDSS.

Accordingly, we requested that the parties submit supplemental briefs regarding the impact of *A.J.L.,* and after considering them, we have revised our opinions, nevertheless keeping our ultimate disposition the same.

In this rare case in which a county department of social services opposes a judgment terminating parental rights, we conclude that the trial court erred in permitting the foster parents to participate fully as intervenors in the termination proceedings. We further conclude this error was reversible with respect to the termination of mother's parental rights and harmless with respect to the termination of father's parental rights. Accordingly, we reverse the judgment with respect to mother, affirm as to father, and remand for further proceedings.

## I. Background

A.M. was born on August 28, 2007, to mother and father, who were seventeen and twenty years old, respectively. In April 2008, his parents brought him to the emergency room to determine the cause of his elbow pain. He was removed from his parents' care and placed in foster care after an emergency room doctor reported finding evidence of possible abuse.

After MCDSS filed a dependency and neglect petition, the court approved treatment plans for both parents in June 2008, and they entered into a deferred adjudication the same day. In September 2008, the child was placed with L.H. and R.H., after the initial foster placement proved unsatisfactory.

MCDSS submitted reports to the court in August and October 2008 indicating that both parents were participating in parenting programs, both were attending couples counseling, and they were planning to be tested for attention deficit hyperactivity disorder (ADHD). The caseworker noted that visitation was "going well."

Reports submitted to the court in December 2008 were less positive. In November, both parents had been evaluated for ADHD by Dr. Raney, a psychiatrist. Dr. Raney concurred with the opinion of Dr. Irwin, a clinical psychologist, that father suffered from ADHD, and she recommended medi-

cation to treat that condition, as well as individual psychotherapy. She did not agree with Dr. Irwin's assessment of mother. She diagnosed mother with post-traumatic stress disorder (PTSD) and "personality disorder with borderline traits." She was so concerned about her findings that she immediately called the caseworker to express her concern about mother's "untreated mental illness" and to recommend that the child should not be returned home because of it. She recommended that mother receive dialectical behavior therapy (DBT) and medication.

Dr. Raney's diagnosis of mother was soon called into question. The therapist who was to provide mother with DBT therapy determined that it was "unnecessary" because "her coping skills were more than adequate." He diagnosed mother with "adjustment disorder, with mixed anxiety and depressed mood." After providing therapy for her for several months, during which she did "very well," and "made moderate progress in learning to effectively manage anxiety and depression," he and the MCDSS caseworker determined that he would close mother's case and her work with her private therapist would continue.

In January 2009, mother's private therapist, Mr. Holton, reported that she was "cooperative and engaged in her treatment." Mr. Holton also saw father individually, and treatment of both mother and father as a couple was scheduled to begin later in the month.

Meanwhile, MCDSS was becoming concerned about visitation based upon information received from the child's foster parents, L.H. and R.H. In early January, L.H. described a number of concerns about the parents' "performance" in a letter sent to the MCDSS caseworker, the GAL, the child's Court Appointed Special Advocate (the CASA), and the child's doctor. Among other things, she reported that the parents were often late picking the child up or returning him; they had missed several visits altogether; and the child was often hungry or dirty when returned to his foster home.

The court ordered mediation between the natural and foster parents, and in February the parties reached an agreement. The parents agreed to pick up the child on time and comply with their treatment plans. They also agreed to continue working with their therapists and treatment providers. In return, MCDSS agreed to allow one overnight visit per week with the child. Overnight visits were to be increased if the parents remained in compliance with their treatment plans. On April 1, 2009, a second mediation resulted in a "memorandum of understanding" similar to the earlier mediation agreement. All parties agreed that overnight visits, which had not been provided, should "resume immediately." They also agreed that the DBT treatment ordered for mother could be "put on the 'back burner.'"

On May 29, and after reviewing reports submitted by MCDSS and the CASA and hearing the comments of the parents' therapist and others, the court ordered the parties to develop a plan for the child to return home.

Less than a week later, on June 4, 2009, the GAL filed an emergency motion to restrict parenting time, citing reports received from the CASA and the foster mother alleging, among other things, that the child had lost 13.5 ounces of weight after being in the parents' care over the weekend of May 30–31, a loss that the GAL called "shocking"; that the parents had been involved in a domestic violence incident on the night of June 1 for which law enforcement officers had been called; that father had stopped taking his medication; that father continued to view pornography in the home; that father had left the child alone in a room and closed the door; that on June 3, mother had left the child with an "unidentified person" when she went to work; and that later that day the child was delivered to the foster mother "dirty, hungry, and wet." The GAL stated that he had been informed that the parents had decided to temporarily separate. The court immediately ordered that all visits of either parent with the child should be supervised.

On July 23, 2009, the foster parents moved to intervene in the proceedings pursuant to

section 19–3–507(5)(a), C.R.S.2010, which provides, as pertinent here:

> Parents, grandparents, relatives, or foster parents who have the child in their care for more than three months who have information or knowledge concerning the care and protection of the child may intervene as a matter of right following adjudication with or without counsel.

The foster parents asserted that they sought to intervene because they had "specific knowledge and information about [the child] and what is in his best interest." Mother objected to the intervention, noting that the foster parents had expressed a desire to adopt the child if an opportunity to do so arose and arguing that there was an "inherent conflict of interest" in allowing the foster parents to continue with the foster care placement while actively advancing their own interests in court. She requested that the court order the immediate removal of the child from the foster parents' care because of the conflict. The foster parents denied the existence of a conflict of interest, asserting that their sole concern was "achieving a safe and permanent home for [the child] as soon as possible." On August 24, 2009, the court ordered that the foster parents be named intervenors "with full party status."

In September 2009, the Kempe Child Protection Team, affiliated with The Children's Hospital in Denver, became involved in the case after the court expressed concern that conflicting mental health recommendations had been made with respect to mother.

In October, the GAL moved to terminate mother's and father's parental rights.

In November, the Kempe Child Protection Team became further involved in the case when MCDSS requested a Kempe State and Regional Referral Team (START) review of the case. Dr. McIlhany, a physician and member of the Kempe Team, reviewed the child's medical records and submitted a report stating that the child's injuries were the result of physical abuse. The GAL asked Ms. Baird, a licensed clinical social worker and member of the Kempe Team, to provide expert testimony on the effect of maltreatment and domestic violence on young children, the role of attachment in the development of young children, and the importance of permanency in the development of young children.

As the case approached trial, the foster parents moved to exercise their right to "full participation" in the termination hearing. In response, MCDSS argued that the foster parents could not have an expectation of a continued foster care placement because the goal of reunification of the child with his natural family had not been abandoned, and, without a constitutionally protected liberty interest in a continued relationship with the child, the foster parents should not be permitted to advocate the termination of the parents' rights. MCDSS took the position that the foster parents' participation in the proceeding should be limited to testifying as to factual matters of which they had personal knowledge. Mother joined in this response. The court was not persuaded, and after reviewing the motion and the responses to it, the court granted the foster parents the right to "cross-examine and call witnesses; whatever they wish to do."

The termination hearing spanned seven days, beginning on January 12, 2010, and concluding on February 9, 2010.

During the seven-day termination trial, the parties presented sharply polarized testimony. The GAL relied on testimony from two doctors at the Kempe Center and Ms. Baird, none of whom had had any personal contact with the child, the parents, or the foster parents. The doctors testified, based on their examination of the child's medical records, that he had suffered seven fractures and a torn fermium during the first seven months of his life. They rejected the parents' explanations that these injuries were caused by excessively tight swaddling, rough play, or a physical illness. Ms. Baird testified that the child should remain with the foster parents because of the time he had already stayed with them and because he was suffering from attachment disorder. The CASA also supported termination of parental rights.

In contrast, all the treating professionals working with mother, including her caseworker and therapist, testified that mother

should be reunited with the child. They agreed that once mother and father separated and a restraining order was entered following the June 2009 domestic violence incident, mother's compliance with the treatment plan improved substantially. At that point, mother recognized that she needed to give first priority to the care of her child and could no longer seek to excuse or justify father's behavior. Mother testified accordingly; while she was still unsure of the cause of the child's injuries, she recognized that father may have caused them, either intentionally or unintentionally. The testimony was undisputed that the child had sustained no further injuries after mother and father had separated.

During the course of the hearing, the foster parents, through their attorney, explicitly advocated the termination of both parents' rights during opening statements; opposed a motion made by mother's attorney to exclude the testimony of three witnesses; made objections; cross-examined numerous witnesses; opposed mother's motion to dismiss the proceedings against her; and, during closing argument, again advocated the termination of the legal relationship between both parents and the child. In addition, both foster parents testified regarding the deficiencies that they perceived in the parents' care of the child and advocated the termination of the parents' rights. MCDSS continued to support reunification of the child with mother (but not father) throughout the proceedings, and the MCDSS caseworker and all the treatment providers testified that they supported reunification. After hearing all the evidence, the court terminated the parental rights of both mother and father.

## II. Role of Foster Parents as Intervenors

MCDSS, mother, and father contend that the trial court committed reversible error by allowing the foster parents to become "full participant intervenors" at the termination hearing. We agree that the trial court erred in allowing full participation by the foster parents as a matter of both statutory interpretation and constitutional law.

## A. Statutory Analysis

Relying on *People in Interest of A.W.R.,* 17 P.3d 192 (Colo.App.2000), MCDSS, mother, and father maintain that section 19–3–507(5)(a) allows the foster parents to intervene as a matter of right, but that their role must be limited to providing information about the child, including during the termination hearing. In contrast, the foster parents contend that section 19–3–507(5)(a) allows them to fully participate in the termination hearing and that *A.W.R.* is distinguishable. We conclude that the statute is ambiguous, but that, considering rules of statutory construction, it must be construed as it was by the *A.W.R.* division to provide a limited right of intervention to foster parents at a termination hearing.

In construing statutory provisions, we strive to give full effect to the legislative intent. *Rider v. State Farm Mutual Auto. Ins. Co.,* 205 P.3d 519, 521 (Colo.App.2009). To give effect to the legislative intent, we look to the words used, reading them in context and according them their plain and ordinary meanings. *Id.; see* § 2–4–101, C.R.S.2010.

To reasonably effectuate legislative intent, a statute must be read and considered as a whole. Where possible, the statute should be interpreted to give consistent, harmonious, and sensible effect to all its parts. *People v. Dist. Court,* 713 P.2d 918, 921 (Colo.1986); *see In re Marriage of Ikeler,* 161 P.3d 663, 666 (Colo.2007). In so doing, we must consider the subparts of a statute and the interaction between them. *Huber v. Kenna,* 205 P.3d 1158, 1162 (Colo.2009).

Where statutory language is clear and unambiguous, the court should apply the statute as written, and may presume that the General Assembly meant what it clearly said. *Griffin v. S.W. Devanney & Co.,* 775 P.2d 555, 559 (Colo.1989). Where a statute is ambiguous, however, the court may look beyond the statutory language to other rules of statutory construction, including review of legislative history, circumstances of the statute's enactment, former statutory provisions, law concerning same or similar objects, and consequences of a particular construction.

*People v. Terry,* 791 P.2d 374, 376 (Colo.1990) (citing *Griffin,* 775 P.2d at 559). A statute is ambiguous if it is susceptible of reasonable, alternative interpretations. *Id.*

We conclude that section 19–3–507(5)(a) grants foster parents the right to intervene during or after the dispositional hearing of a dependency and neglect proceeding. We further conclude that foster parents may participate fully in a dispositional hearing, but have only a limited right to provide information at a termination hearing. We reach these conclusions after first determining that the statute is ambiguous, and then reading it in context, considering its legislative history, and reviewing its judicial construction.

### 1. Ambiguity

We conclude that section 19–3–507(5)(a) is ambiguous because it is susceptible of reasonable, alternative interpretations. As noted, that section provides that foster parents "who have information or knowledge concerning the care and protection of the child may intervene as a matter of right following adjudication with or without counsel." Thus, the statute provides foster parents with an unconditional right to intervene in a dependency and neglect proceeding "following adjudication." *See* C.R.C.P. 24(a)(1) (anyone shall be permitted to intervene when a statute confers an unconditional right to intervene).

Nevertheless, because of subsection (5)(a)'s language and its placement in a statute with the heading "Dispositional hearing," we conclude that the statute is ambiguous with regard to the scope and timing of permissible intervention. In other words, can foster parents participate fully in all phases of a dependency and neglect case, or does the permissible extent of participation depend on the issues raised at particular hearings? Also, may foster parents intervene at a dispositional hearing, or may they intervene any time after adjudication?

Here, on the one hand, the statute conceivably could be interpreted as the foster parents contend to allow their intervention for purposes of participating fully in a termination hearing. This interpretation is plausible, because the plain language of section 19–3–507(5)(a) does not expressly limit the scope or timing of foster parents' participation. In addition, the statute provides only that foster parents may intervene "after adjudication," but does not otherwise specify when they may intervene. Further, we are aware of no other statute that affords an individual only a limited statutory right to intervene.

On the other hand, the position of MCDSS, mother, and father that the statute affords foster parents only a limited right of intervention is also reasonable. The intervention statute refers to foster parents "who have information or knowledge concerning the care and protection of the child," which suggests that their intervention should be limited to providing information on such topics. As noted, the intervention statute is contained in a statute titled "Dispositional hearing." If foster parents are permitted to participate fully in a termination hearing, they will be involved in a part of the case in which they have no direct, immediate interest—the termination of parental rights. In contrast, when foster parents intervene at a dispositional hearing, they may have a direct, immediate interest in the adoption of a treatment plan, particularly its visitation provisions.

Accordingly, we conclude that the statute is ambiguous and, therefore, we turn to other rules of statutory construction to determine its meaning.

### 2. Statutory Context

To determine the legislative intent concerning the statute authorizing foster parents' to intervene in dependency and neglect proceedings, we look to related statutes that provide for participation by foster parents.

Section 19–3–502(7), C.R.S.2010, provides for foster parents to receive notice of all hearings and to have the right to be heard, but not to be made parties. It states, in pertinent part:

> In addition to notice to all parties, the court shall ensure that notice is provided of all hearings and reviews held regarding a child to the following persons with whom a child is placed: Foster parents, preadoptive parents, or relatives. Such persons shall have the right to be heard at

such hearings and reviews. The persons with whom a child is placed shall provide prior notice to the child of all hearings and reviews held regarding the child. The foster parent, pre-adoptive parent, or relative providing care to a child shall not be made a party to the action for purposes of any hearings or reviews solely on the basis of such notice and right to be heard.

Similarly, section 19–3–507(5)(b) and (c), C.R.S.2010, provide that a county department of social services shall provide foster parents, among others, with notice of any administrative reviews and court hearings.

Accordingly, under these statutes, foster parents may participate at any hearing in a dependency and neglect proceeding. However, without intervening, they are not afforded party status, and therefore, would not be permitted to call or cross-examine witnesses.

Moreover, the right of foster parents to be heard at all proceedings must be contrasted to their right to intervene. Why did the General Assembly distinguish foster parents' right to intervene from their right to be heard at all proceedings in a dependency and neglect case? The answer to this question may be found in the legislative history and judicial construction of sections 19–3–507 and 19–3–502(7).

### 3. Legislative History

In 1993, the General Assembly created the Colorado Foster Parent Rights and Responsibilities Task Force, to consider the right of foster parents to be named as interested parties in any court proceeding involving a foster child. Ch. 236, sec. 1, § 19–3–209(2), 1993 Colo. Sess. Laws 1248–49 (renumbered as § 19–3–210(2); repealed Aug. 7, 1996). In its final report, the Foster Parent Task Force recommended the adoption of legislation to establish the right of foster parents to be regarded as parties in court. Colorado Foster Parent Rights and Responsibilities Task Force, Summary of the Final Report, Recommendation No. 11 (1995). The task force advised that "the right of foster parents to be a party in court ... supports the team concept and a non-adversarial approach," and "provides for equal participation, representation and input." *Id.* The task force's emphasis on a "non-adversarial approach" suggests that the task force did not intend foster parents to act as adversarial parties in a termination hearing.

In 1994, the General Assembly established the Recodification of the Children's Code Task Force to evaluate the overall effectiveness of the Children's Code, identify areas requiring revision, and advise the legislative oversight committee of legislative proposals for recodification. Ch. 263, sec. 1, § 19–1.5–103(3), 1994 Sess. Laws 1478. The Recodification Task Force's final report included the following recommendation:

> That § 19–3–507, C.R.S., be amended to allow grandparents, relatives, foster parents and other interested parties (as defined by case law) with information regarding the care and treatment of the child, to intervene as a matter of right, with or without counsel, following an adjudication.

Task Force for the Recodification of the Children's Code, Final Report 69.

The Recodification Task Force's recommendation was included first in H.B. 1322, and after it was not enacted, it was included again in S.B. 218. S.B. 218 was enacted, and one of its provisions was codified as section 19–3–507(5), although the provision was first stripped of the language, "other interested parties, including friends of the family, may intervene by permission of the court." Hearings on S.B. 218 before the First Conference Comm., 61st Gen. Assemb., 1st Sess. (May 5, 1997) (House Committee of Reference Report 16, lines 18–19) (remarks of Representative Adkins).

Testimony from the hearings on H.B. 1322 reflects the General Assembly's intent to secure the right of foster parents and relatives to intervene in the dispositional hearing of a dependency and neglect proceeding. During the legislative hearings, Representative Adkins, a member of the House Judiciary Committee, testified as to the foster parents' intervention as a matter of right: "This is only at the dispositional hearing. So we're only talking at one stage of the process where they would be intervenors of right." Hearings on H.B. 1322 before the H. Judiciary Comm., 61st Gen. Assemb., 1st Sess.

(Mar. 11, 1997). Representative Adkins's statement indicates that the General Assembly intended to limit foster parents' right of intervention to the dispositional hearing of a dependency and neglect proceeding. Neither Representative Adkins nor other witnesses, however, addressed what role intervening foster parents would have following a dispositional hearing.

However, if the General Assembly had intended to provide for full participation by foster parents in dependency and neglect proceedings following dispositional hearings, it could have inserted the language of subsection (5) in a more general statute, rather than in section 19–3–507, which is entitled "dispositional hearing." Alternatively, the General Assembly could have inserted the language of subsection (5) in those portions of the Children's Code, such as sections 19–3–601 to –611, which concern the termination of parental rights. The General Assembly did not do so.

Section 19–3–502(7) was enacted as part of H.B. 1307 in 1998 to bring Colorado into compliance with the Adoption and Safe Families Act of 1997, Public Law 105–89, 111 Stat. 2115.[1]

During a hearing before the House Judiciary Committee in February 1998, Representative Keller explained that the purpose of H.B. 1307 was to bring Colorado into compliance with the 1997 federal law, and that section 19–3–502(7) "is adding individuals who have for years wanted to be a part of the case and were not allowed to be in some cases." Hearings on H.B. 1307 before the H. Judiciary Comm., 61st Gen. Assemb., 2d Sess. (Feb. 10, 1998). Representative Keller further noted that under section 19–3–502(7), foster parents who were previously not allowed to present information to the court would have the opportunity to do so. *Id.*

In 2004, the General Assembly amended the intervention statute, section 19–3–507(5) by adding subsections (5)(b) and (5)(c), and

designating the original language as (5)(a). Ch. 271, sec. 1, § 19–3–507(5)(a)–(c), 2004 Colo. Sess. Laws 972–73. Section 19–3–507(b) and (c) granted foster parents the right to receive notice of any administrative reviews and to request written notice of any court hearings regarding foster children in their care.

Two years later, the General Assembly amended section 19–3–502(7) to comply with the Safe and Timely Interstate Placement of Foster Children Act of 2006, which granted foster parents, pre-adoptive parents, and relative caregivers the "right" to be heard rather than merely an "opportunity" to be heard. Public Law 109–239, 120 Stat. 508; *see* 42 U.S.C. § 675(5)(G).

Accordingly, sections 19–3–507(5) and 19–3–502(7) now provide overlapping rights to foster parents. Both sections grant foster parents the right to receive notice of all hearings and reviews regarding the child's case. Section 19–3–502(7) also provides foster parents the right to be heard at all hearings or reviews of the foster child's case. Nevertheless, we deem it significant that the right to intervene "after adjudication" is included only in section 19–3–507(5)(a), which concerns dispositional hearings, and not in the more general section 19–3–502, C.R.S. 2010, which concerns the form and content of a petition in a dependency and neglect case.

#### 4. Judicial Construction of Section 19–3–507

■ Because the 2004 amendments to section 19–3–507 did not contradict or modify Representative Adkins's testimony that foster parents' right to intervene as full participants is limited to a dispositional hearing, they support her testimony concerning the statute's legislative intent. *See Hyland Hills Park & Recreation Dist. v. Denver & Rio Grande W. R.R. Co.*, 864 P.2d 569, 574 n. 7 (Colo.1993) (statements of individual legisla-

---

1. As originally enacted, the Adoption and Safe Families Act of 1997, 42 U.S.C. § 675(5)(G), required states to ensure "the foster parents (if any) of a child and any preadoptive parent or relative providing care for the child are provided with notice of, and an opportunity to be heard in, any review or hearing to be held with respect to

the child, except that this subparagraph shall not be construed to require that any foster parent, preadoptive parent, or relative providing care for the child to be made a party to such a review or hearing solely on the basis of such notice and opportunity to be heard."

tors at committee hearings indicate legislative intent). In addition, when the General Assembly chooses to legislate in a particular area, it is presumed to be aware of existing case law precedent. *Vigil v. Franklin*, 103 P.3d 322, 327–28 (Colo.2004); *Vaughan v. McMinn*, 945 P.2d 404, 409 (Colo.1997).[2]

Prior to the 2004 amendment, a division of this court addressed the scope of a foster parent's right to intervene pursuant to section 19–3–507. *See A.W.R.*, 17 P.3d at 197.

In *A.W.R.*, following a dispositional hearing but before a permanency planning hearing, the foster mother was permitted to intervene pursuant to what was then section 19–3–507. The issue at the permanency planning hearing was whether the child could be returned to the biological mother. *A.W.R.*, 17 P.3d at 197. The foster mother argued that as an intervenor pursuant to section 19–3–507(5), she was entitled to full participation in the permanency planning hearing. The *A.W.R.* division rejected the foster mother's contention that the juvenile court erred in limiting her participation in the permanency planning hearing. *Id.*

In rejecting her contentions, the *A.W.R.* division concluded, based on review of Colorado's dependency and neglect statutory scheme, that foster parents, even as intervenors of right, had a limited role at a permanency planning hearing. The division determined that until parental rights were terminated or the goal of reunification of parent and child had been abandoned, foster parents could only provide direct testimony concerning the child's best interests, and that the trial court did not abuse its discretion in so limiting the foster mother's testimony.

Because the General Assembly amended section 19–3–507 four years after *A.W.R.* was

decided, we may presume that the General Assembly was aware of *A.W.R.* and did not disagree with the *A.W.R.* division's interpretation of section 19–3–507. *Vigil*, 103 P.3d at 327.

■ Accordingly, we reaffirm the statutory analysis in *A.W.R.* Based on that analysis, we conclude, for the reasons discussed below, that foster parents may intervene as full participants under section 19–3–507(5)(a) only in dispositional hearings.[3] When they intervene after a dispositional hearing, their role is necessarily more limited. Thus, under section 19–3–502(7), foster parents may exercise their right to be heard during a termination hearing, while under section 19–3–507(5)(a) they may intervene and participate fully during a dispositional hearing.

This dual role accords with the statutory scheme. Foster parents may exercise their right to be heard at all hearings, including termination hearings. They may intervene and participate fully in dispositional hearings, where they may advocate for provisions of a treatment plan which could assist the court in determining the best interests of the child. However, they may not intervene as full participants in a termination hearing because they do not have a direct legal interest in the termination of parental rights. As section 19–3–507(5)(a) provides, foster parents' role should be limited to providing information as to "the care and protection of the child," but they may not advocate for termination of parental rights.

■ In this case, the trial court acknowledged *A.W.R.* when it granted the foster parents' motion to intervene. In addressing the motion to intervene, the trial court stated: "I may limit what they [the foster parents] can testify to, relying on ... *A.W.R.*,

**2.** The legislature is also presumed to adopt prior judicial constructions of language employed in subsequent legislation. *Vaughan*, 945 P.2d at 409. Here, the 2004 amendments modified section 19–3–507(5), the precise section at issue here. This presumption applies here, even though the legislature added subsections (b) and (c), and designated the intervention statute as subsection (5)(a).

**3.** Section 19–3–508(1), C.R.S.2010, does not require a different result. That statute contem-

plates that a proposed disposition may be termination of the parent-child legal relationship, but that alternative only applies when no treatment plan can be adopted. In that event, the court generally will conduct a permanency planning hearing, at which foster parents' involvement would be limited in accordance with *A.W.R.*, unless the goal of reunification of parent and child had been abandoned. In that event, as indicated in *A.W.R.*, full participation by intervening foster parents would be permissible.

which is a court of appeals case ... and that case allowed the foster parents to intervene." Nevertheless, the trial court did not limit the foster parents' testimony or the advocacy of their attorney in favor of termination of parental rights. In not following *A.W.R.*, the trial court erred. This error was not harmless, because it substantially affected mother's rights.

Here, the foster parents advocated for termination of the parental rights of mother and father, through both their testimony and arguments of their attorney. Additionally, through extensive cross-examination of various witnesses, the foster parents' attorney elicited detrimental information concerning mother and father that was not based on the foster parents' personal knowledge. For example, the attorney raised questions concerning mother's and father's domestic violence issues and their attentiveness to treating the child's medical problems.

Further, in closing argument, the foster parents' attorney emphasized the child's attachment to the foster parents, arguing that it would be "horrifically detrimental" to end the child's attachment to the foster parents and suggested that termination of parental rights was necessary in order to "keep this little boy safe." Thus, at every turn, the foster parents attempted to portray mother and father as bad parents and themselves, by implication, as good parents and the best possible choice for permanent placement for the child.

If a dependency and neglect proceeding were intended to identify the best possible home for a child, and foster parents were deemed to have rights equal to those of the child's natural parents, the participation of foster parents as full parties in the proceeding would not be problematic. However, no Colorado court has ever suggested that foster parents have rights equivalent to those of natural parents, and the Children's Code is intended to "preserve and strengthen family ties whenever possible," § 19–1–102(1)(b) (purposes of Children's Code), rather than break up families in order to provide children with "better" parents. *See People in Interest of E.A.*, 638 P.2d 278, 285 (Colo.1981) (a child's care and guidance preferably should be administered by his or her natural parents and the parental relationship should not be terminated simply because the child's condition thereby might be improved).

■ The rehabilitative purposes of the Children's Code are reflected in the termination criteria set forth in section 19–3–604, C.R.S.2010, which provides that the legal relationship between a parent and his child may be terminated only if the court finds, among other things, that the parent is unfit and that the parent's conduct or condition is unlikely to change within a reasonable time. § 19–3–604(1)(c)(II)–(III), C.R.S.2010. The requirement that the trial court "strictly comply" with the appropriate standards for termination, *K.D. v. People*, 139 P.3d 695, 700 (Colo.2006), serves to protect the parent's substantive due process rights by discouraging termination for reasons other than those specified in section 19–3–604.

By implicitly—and sometimes explicitly—encouraging the court to terminate the parents' rights so that they could adopt the child and provide him with a "better" home, the foster parents encouraged the court to terminate the parents' rights for a reason not recognized or approved in Colorado law.

### B. The Constitutional Rights of Parents and Foster Parents

■ MCDSS, mother, and father further contend that the trial court violated the constitutionally protected liberty interest of mother and father in the parent-child legal relationship by allowing the foster parents to fully participate in the termination proceeding as intervenors. We agree.

Not only does section 19–3–507(5)(a) limit the scope of the foster parents' intervention, so too do constitutional considerations.

■ It is well established that parents have a fundamental liberty interest in the care, custody, and management of their children. *See Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *People in Interest of A.M.D.*, 648 P.2d 625, 632 (Colo.1982). This interest "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Id.* (quoting

*Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).

Whether foster parents have a similar liberty interest is less clear. In *Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 844, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), the Supreme Court considered the issue and noted that in some circumstances, a foster family may "hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family." However, the *Smith* Court also noted important distinctions between a foster family and a natural family, including the fact that the foster family's relationship with the child has its source in state law and contractual relationships. The Court indicated, in dictum, that if the interest claimed by a foster family "derives from a knowingly assumed contractual relation with the State," then "it is appropriate to ascertain from state law the expectations and entitlements of the parties." *Id.* at 845–46, 97 S.Ct. 2094.

The *Smith* Court also acknowledged,

At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family.

*Id.* at 844, 97 S.Ct. 2094. In addition, the Court noted that while a foster family has its source in state law and contractual arrangements, a natural family has an interest in family privacy whose source derives not from state law, "but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.'" *Id.* at 845, 97 S.Ct. 2094 (quoting *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)).

Accordingly, the *Smith* Court concluded that the limited recognition accorded to the foster family under New York statutes and the contracts executed by the foster parents there argued against any but the most limited constitutional liberty interests of foster families. *Id.* at 846, 97 S.Ct. 2094.

Significantly, the *Smith* Court also noted that even if foster parents do have a constitutionally protected liberty interest, it is much less than that of natural parents. As the Court concluded, "[w]hatever liberty interest might otherwise exist in the foster family as an institution, that interest must be substantially attenuated where the proposed removal from the foster family is to return the child to his natural parents." *Id.* at 846–47, 97 S.Ct. 2094.

In *A.W.R.,* 17 P.3d at 195, a division of this court relied on this language from *Smith* to conclude that in a permanency planning hearing under Colorado law, a foster mother's relationship with a child "did not give rise to a constitutionally protected liberty interest, and she was not entitled to the procedural protections of the [D]ue [P]rocess [C]lause of the federal or state constitution." *Id.* at 197.

In reaching its conclusion, the *A.W.R.* division relied on decisions from a majority of courts in other jurisdictions that have found that foster parents do not have protected liberty interests. In contrast, it noted that a few courts had found that a foster parent has a constitutionally protected interest in certain limited situations. *Id.* at 196. As noted, here, the trial court acknowledged *A.W.R.,* but did not address the parents' constitutionally protected liberty interest in the care, custody, and control of their son.

On appeal, the foster parents and the GAL contend that *A.W.R.* should be limited to its facts and that, under the circumstances presented here, the liberty interests of mother and father should not detract from the foster parents' participation as intervenors in this case. We decline to read *A.W.R.* so narrowly.

Rather, we conclude that *A.W.R.* should be extended to termination hearings. Accordingly, we further conclude that a foster parent's relationship with a child does not give rise to a constitutionally protected liberty interest at such hearings. Thus, a foster parent is not entitled to the protection of the Due Process Clauses of the federal and state constitutions at a hearing on the termination of parental rights.

Without a constitutionally protected liberty interest, foster parents do not have a constitutional (or statutory) interest that entitles them to full participation in a termination of parental rights hearing. To conclude otherwise would allow foster parents who have no direct interest in the constitutionally protected rights of natural parents to argue that those rights should be terminated so that they subsequently could seek to become adoptive parents.

Nevertheless, the foster parents, joined by the GAL, argue that *A.W.R.* is distinguishable on its facts because here, a motion for the termination of parental rights had been filed and was "actively being pursued"; reunification of the child with his parents had proven "unrealistic" at the time of the termination hearing; and the child was in the foster parents' custody at the time of the termination hearing and had been in their custody for sixteen months. We are not persuaded by these three distinguishing factors.

First, the fact that a motion for termination had been filed and was "actively being pursued" is not an indication that the goal of reunifying the family had been abandoned, particularly when MCDSS opposed the motion. Efforts to place a child for adoption or with a legal guardian or custodian may be made concurrently with reasonable efforts to preserve and reunify the family, and even after the focus shifts to finding a permanent home, reasonable efforts to preserve the biological family must continue. *A.W.R.*, 17 P.3d at 196.

Second, our review of the record indicates that MCDSS did not believe that reunification was "unrealistic"; on the contrary, MCDSS consistently maintained that the child should be reunited with mother and that was the goal toward which her treatment providers were working.

Third, the fact that the child was in the foster parents' custody for an extended period is not sufficient to show that they had reason to expect that the foster parent-foster child relationship, which is normally temporary, would continue. Foster parents have not cited any provision of Colorado law that grants them rights from which a constitution-

ally protected liberty interest in a continued relationship might be derived, and because the record does not include the contract under which they provide foster care services, we are unable to determine whether a contractual basis might exist for an expectation of a continued relationship. Moreover, foster parents have not cited any authority, and we are aware of none, for the proposition that an expectation of a continued relationship between a foster parent and a foster child could arise while the parental rights of one or both of the child's biological parents remain intact and the parents are actively engaged in efforts to reunite with the child.

Because the foster parents could not have had a realistic expectation of continuation of the foster parent-foster child legal relationship under these circumstances, the relationship did not give rise to a constitutionally protected liberty interest, and they were not entitled to the procedural protections of the Due Process Clause of the federal or state constitution. See *A.W.R.*, 17 P.3d at 197.

In reaching this conclusion, we also reject the foster parents' contention that allowing their full participation in the termination hearing does not detract from the constitutional rights of mother and father because they were both afforded a full opportunity to participate and be heard at the termination hearing.

As the *A.W.R.* division noted, the foster mother there did not have a constitutionally protected liberty interest in the continuation of her relationship with the child. The mother and the child were the parties with the legal interest in the issue of whether the child could be returned to the mother. In that regard, the foster mother did not have a legal interest. This conclusion applies all the more to a termination hearing, where the foster parents do not have a legal interest in whether a child can be returned to his or her mother.

Because the foster parents here did not have a constitutionally protected liberty interest in the continuation of their relationship with the child, their role should have been limited to providing testimony regarding the child's best interests. *See id.*

Without a constitutionally protected liberty interest, the foster parents may not advocate for termination of the parental rights of mother and father. Even though mother and father had been given notice of the termination hearing and participated fully in that hearing, the foster parents could not properly advocate for termination of parental rights. To conclude otherwise would allow not only foster parents, but grandparents and other relatives "who have information and knowledge concerning the care and protection of the child" to advocate a position in which they do not have a legal interest.[4]

Accordingly, we conclude that during a hearing on the termination of parental rights, foster parents, as intervenors, may not call or cross-examine witnesses and may not argue that the rights of the natural parents should be terminated or that the child should be placed with the foster parents. Here, as noted, although the trial court acknowledged the applicability of *A.W.R.* in granting the foster parents' motion to intervene, it did not limit their participation in any way during the termination hearing.

Therefore, we conclude that the trial court erred in allowing the foster parents to participate fully as intervenors in the termination hearing.

### C. Harmless Error

An error is harmless if it does not affect the substantial rights of the parties. *See* C.A.R. 35(e) (the appellate court shall disregard any error or defect not affecting the substantial rights of the parties); *Leiting v. Mutha,* 58 P.3d 1049, 1053–54 (Colo.App. 2002) (proper inquiry in deciding a harmless error question is whether the error substantially influenced the verdict or affected the fairness of the trial). This test applies to the statutory analysis in part A above.

The appropriate harmless error standard with respect to a parent's constitutional rights in a dependency and neglect case has not been addressed by Colorado's appellate courts. It could be harmless beyond a reasonable doubt, *see People v. Orozco,* 210 P.3d 472, 476 (Colo.App.2009); harmless by clear and convincing evidence, *see Denny H. v. Superior Court,* 131 Cal.App.4th 1501, 1514–15, 33 Cal.Rptr.3d 89, 97 (2005); or the ordinary harmless error stated above. Because this issue was not raised by the parties, we do not address it. *See also In re James F.,* 42 Cal.4th 901, 915, 70 Cal.Rptr.3d 358, 174 P.3d 180, 189 (2008) (constitutional error in dependency and neglect case is not structural; harmless error analysis applies).[5]

As noted, we apply the ordinary harmless error standard to the statutory analysis. For purposes of this opinion, we will assume that the test for the constitutional issue is the constitutional harmless error standard of harmless beyond a reasonable doubt. Applying these standards, we conclude, as discussed below, that the statutory error discussed in part A was harmless with respect to father, but not with respect to mother. For the constitutional issue, we similarly conclude that the error discussed in part B was harmless beyond a reasonable doubt as to father, but not harmless beyond a reasonable doubt with respect to mother.

The GAL argues that if the trial court erred in allowing the foster parents to participate fully in the proceedings, any such error was harmless. In support of this argument, he states that the attorney for the foster parents examined no witness other than by cross-examination; the same opportunity was provided to all parties; and the court's fundamentally fair procedures did not deprive the parents of notice and an opportunity to be heard.

---

**4.** This possibility would expand the scope of termination hearings beyond the General Assembly's intent. In this case, for example, the termination hearing lasted seven days and included participation by the GAL (an attorney) and attorneys for MCDSS, mother, father, the foster parents, and one set of grandparents.

**5.** Structural error has not been applied in any reported civil case in Colorado. *See Black v.*

*Southwestern Water Conservation Dist.,* 74 P.3d 462, 473 (Colo.App.2003). However, courts in at least two other jurisdictions have applied the concept to cases involving termination of parental rights. *See In re Adoption of B.J.M.,* 42 Kan. App.2d 77, 209 P.3d 200, 207 (2009); *In re Torrance P.,* 298 Wis.2d 1, 724 N.W.2d 623, 635 (2006).

■ With respect to father, as discussed in part IV below, we acknowledge that the evidence supporting the termination of his parental rights was strong and the grounds for termination of his parental rights likely could have been established without the foster parents' participation in the proceedings. Thus, we conclude that the error was harmless with respect to father, in regard to both the statutory and constitutional issues.

■ With respect to mother, we cannot conclude that the foster parents' participation did not substantially influence the termination order and affect the fairness of the termination proceeding. Because of the foster parents' significant participation in the termination hearing, when they lacked a legal interest in the termination of parental rights, the entire hearing involved two parties advocating for termination of parental rights and attempting to show that mother and father were unfit parents. This placed an additional burden on counsel for mother and MCDSS not present in other termination proceedings. The cumulative effect was to unduly emphasize the testimony of the GAL's witnesses and to unduly cast doubt on the credibility of the witnesses presented by MCDSS and mother.

Under these circumstances, allowing the foster parents to participate fully in the termination proceedings was not harmless error. Unlike many dependency and neglect termination proceedings, this was a close case, in which all but one of the numerous witnesses who had worked directly with mother testified against termination of her parental rights. Had the foster parents' participation been more limited, we are not persuaded that the result would have been the same.

■ For these same reasons, we also conclude that the violation of mother's constitutional rights was not harmless beyond a reasonable doubt. In a criminal case, "if there is a reasonable possibility that the defendant could have been prejudiced, the error cannot be harmless beyond a reasonable doubt." *People v. Trujillo*, 114 P.3d 27, 32 (Colo.App.2004). Applying that standard here, we conclude there is a reasonable possibility that mother could have been prejudiced

by the foster parents' full participation, considering their lack of a legal interest in termination of mother's parental rights and the substantial evidence presented in favor of mother.

We therefore conclude that the trial court erred in allowing the foster parents to participate fully in the termination proceeding as intervenors and that because the error affects the substantial rights of mother and was not harmless beyond a reasonable doubt, reversal of the judgment and remand for further proceedings are required with respect to her. However, for the reasons discussed below, we conclude that the intervention of the foster parents was harmless error with respect to father.

### III. Termination of Mother's Parental Rights

■ Mother and MCDSS contend that in terminating mother's parental rights, the trial court erred in failing to consider the totality of the evidence, and more specifically, erred in failing to attribute more weight to the most recent reports and evaluations, including the testimony of the treating professionals and the MCDSS caseworker, all of whom supported the reunification of mother and the child. Since we reverse the trial court's judgment with respect to mother's parental rights in part II, we need not address whether the totality of the evidence supports termination of her parental rights. However, because the issue of giving greater weight to more recent evidence is likely to arise on remand, we will address it. In so doing, we conclude that if another motion to terminate parental rights is filed on remand, the trial court may, but need not, attribute more weight to the most recent reports and evaluations.

In its recent opinion in *People in Interest of A.J.L.*, the supreme court held that

> while a trial court may properly attach more weight to more recent evidence, *People in Interest of L.D.*, 671 P.2d 940, 945 (Colo.1983), whether it should do so is necessarily determined by its assessment of witness credibility, and its analysis of

the sufficiency and probative value of the evidence presented at trial.

Accordingly, the supreme court concluded that whether to afford more weight to more recent evidence "falls squarely within the discretion of the trial court." The supreme court also concluded that while a trial court may accord more weight to more recent evidence in some instances, it is not required to do so.

Therefore, on remand, the trial court should determine whether to give more weight to more recent evidence, recognizing, of course that it is not in any way required to do so.

## IV. Termination of Father's Parental Rights

■■ Father contends that his parental rights were also erroneously terminated as a result of the court's focus on the child's first year and the parents' compliance with their treatment plans during that period. We do not agree.

Father's situation is very different from mother's. While mother substantially complied with her treatment plan after she and father separated in June 2009, father's compliance with his treatment plan deteriorated after that point. The caseworker reported that father had "slacked off" in his participation in therapy and made only "minimum effort" in visitation with the child. Plans for couples counseling had to be eliminated when a restraining order was entered against him following the domestic violence incident that led to his separation from mother. The caseworker reported that she did not perceive an emotional attachment between the child and father. Neither she nor any of father's treatment providers recommended reunification of father and the child.

Because the more recent evidence, as well as the earlier evidence, supports the trial court's findings that father failed to comply with his treatment plan, that he is unfit, and that his conduct or condition is unlikely to change within a reasonable time, we conclude that the trial court properly terminated father's parental rights.

## V. Conclusion

Because the foster parents have no statutory right to intervene in termination proceedings and no liberty interest in the continuation of their relationship with the child, and thus no legal interest in the determination whether the relationship between the child and his biological parents should be terminated, we conclude that the court erred in allowing the foster parents to participate fully as intervenors in the termination proceeding. As a result, the judgment terminating mother's parental rights must be reversed and the case remanded for further proceedings as to her. However, we conclude the error was harmless with respect to father and affirm the termination of his parental rights.

■■ Generally, in proceedings on remand, the trial court must consider evidence of changed conditions. *See People in Interest of M.M.*, 188 Colo. 199, 203–04, 533 P.2d 913, 915–16 (1975) (where three years had elapsed since original hearing, trial court could not properly ignore possible evidence of changed conditions in entering new judgment on basis of original record, but was obliged to give parents opportunity to establish that conditions had changed).

Here, more than eight months will have elapsed when the trial court receives the case on remand. Such a period is lengthy for a very young child. Therefore, upon remand the trial court shall permit the parties to present evidence and argument as to whether the condition or circumstances of mother have changed.

The court shall also order MCDSS to prepare and implement an amended treatment plan for mother, if further proceedings occur in this case. Mother should be afforded a reasonable period to complete any amended treatment plan and demonstrate her fitness before the court entertains any future motion to terminate parental rights.

Further, if the court determines that reunification of mother and the child is appropriate, MCDSS, together with mother and the foster parents, should develop a transition plan to enable the child to return to mother's custody with due regard for the child's rela-

tionships with mother and the foster parents. Such transition plan should be in accord with testimony presented by MCDSS caseworkers concerning their experience implementing transition plans in similar cases.

The judgment terminating parental rights is reversed as to mother but is affirmed as to father, and the case is remanded for further proceedings as directed.

Judge RICHMAN concurs.

Judge J. JONES concurs in part and dissents in part.

Judge J. JONES concurring in part and dissenting in part.

I concur in the majority's decision to affirm the district court's judgment terminating father's parental rights as to A.M., albeit for reasons different from those articulated by the majority. I also concur in the majority's conclusion that the district court is not required to give more weight to the most recent reports and evaluations. I dissent from the majority's opinion in all other respects.

My differences with the majority are as follows:

1. The majority interprets the intervention statute, section 19–3–507(5)(a), C.R.S. 2010, in a manner inconsistent with its plain language. Section 19–3–507(5)(a) unambiguously permits qualifying foster parents to "intervene"—that is, to participate in the case as parties—at any time "following adjudication." The statute places no temporal or substantive limits on such intervention, and is not rendered ambiguous merely because the General Assembly did not include such limitations in the statute. The foster parents were entitled to intervene following adjudication, and their full participation as parties in the case from that point forward was consistent with the statute's plain language.

2. The majority's interpretation of section 19–3–507(5)(a) is inconsistent with the very legislative history it cites. If anything, that legislative history reveals that the General Assembly intended that a qualifying foster parent would be a *party* to any proceeding involving a foster child with the right of "equal participation."

3. The parents' constitutional liberty interest in the parent-child relationship does not give them the right to exclude admissible evidence relevant to determining the child's best interests in a termination hearing. The majority's conclusion that it does (for that is the effect of its decision) is unprecedented and inconsistent with settled principles of due process applicable in this context.

4. In the course of its harmless error analysis, the majority ascribes to the district court reasons for its determination to terminate parents' parental rights for which there is no support in the record. The district court's thorough written order demonstrates that it applied the correct statutory standards in making the termination findings. There is nothing in the record indicating that the court treated the hearing as a custody dispute between the parents and foster parents.

5. The district court's thorough written order demonstrates that the court carefully weighed the extensive evidence introduced at the hearing—which the majority concedes was conflicting—and, exercising its right as the fact finder to determine what weight to accord different parts of the evidence, reached conclusions that are supported by evidence in the record.

I explain my conclusions more fully below.

I. Construction of Section 19–3–507(5)(a)

Section 19–3–507(5)(a) provides:

Parents, grandparents, relatives, or foster parents who have the child in their care for more than three months who have information or knowledge concerning the care and protection of the child may intervene as a matter of right following adjudication with or without counsel.

The principles governing the interpretation of this statutory provision are well-settled.

- We must discern and give effect to the General Assembly's intent. *Ceja v. Lemire,* 154 P.3d 1064, 1066 (Colo.2007).
- To do this, we look first to the statute's language, giving words and phrases therein their plain and ordinary mean-

ings. *Id.; Bd. of County Comm'rs v. Costilla County Conservancy Dist.,* 88 P.3d 1188, 1193 (Colo.2004).

- If, upon ascribing such meanings to the statute's words and phrases, we determine the statute is unambiguous, we (1) apply it as written, giving full effect to the words the General Assembly chose, and (2) do not look to extrinsic indications of legislative intent. *Ceja,* 154 P.3d at 1066; *Costilla County Conservancy Dist.,* 88 P.3d at 1193; *State v. Nieto,* 993 P.2d 493, 500 (Colo.2000).

- But if we determine the statute is susceptible to more than one reasonable interpretation, we may look to extrinsic indications of legislative intent to resolve the ambiguity. *Costilla County Conservancy Dist.,* 88 P.3d at 1193; *see* § 2–4–203, C.R.S.2010.

The majority concludes that section 19–3–507(5)(a), which does not mention dispositional hearings, is ambiguous because (1) the heading of the section in which it is located is "Dispositional hearing," (2) it limits intervention to those "who have information or knowledge concerning the care and protection of the child," and (3) it does not limit the timing of intervention (beyond indicating that it may occur "following adjudication") or the nature of foster parents' participation.

It is doubtful that a heading in a statute may be used to create an ambiguity rather than merely to resolve one. *Compare* § 2–5–113(4), C.R.S.2010 ("The ... section headings [of the Colorado Revised Statutes] ... shall be construed to form no part of the legislative text ...; therefore, no implication or presumption of a legislative construction is to be drawn therefrom."), *and Jefferson County Bd. of Equalization v. Gerganoff,* 241 P.3d 932, 935–36 (Colo.2010) (stating that a statute's heading may be considered in determining legislative intent if the court first determines that the statutory language is ambiguous), *with Allely v. City of Evans,* 124 P.3d 911, 913 (Colo.App.2005) (when a heading is part of the statute adopted by the General Assembly, it may be considered as an aid in construing the statute); *see generally* 2A Norman J. Singer & J.D. Sambie Singer, *Statutes and Statutory Construction*

§ 47.14 (2007). But even if a heading may be considered in determining whether a statute is ambiguous, the heading at issue here does not render section 19–3–507(5)(a) ambiguous.

Because a dispositional hearing must follow on the heels of an adjudication, *see* §§ 19–3–505(7)(b), 19–3–507(1)(a), C.R.S. 2010, and qualified foster parents (and other specified interested parties) may not intervene until after there has been an adjudication, *see* § 19–3–507(5)(a), it makes sense for the General Assembly to have included a provision saying when foster parents may intervene as a matter of right in a section of the Children's Code dealing with dispositional hearings. It in no way follows that, absent any textual limitation on the intervenors' subsequent participation, inclusion of the provision in this section implicitly indicates such a limitation.

In terms of statutory placement, section 19–3–507(5)(a) is analogous to section 19–3–502(7), C.R.S.2010. The latter provides that foster parents, among others with whom a child has been placed, must be notified of and be afforded the right to be heard at "all hearings and reviews held regarding a child...." There is no question that this includes *all* hearings and reviews subsequent to the filing of a dependency and neglect petition. The fact that the provision is included within a statute that addresses petitions for dependency and neglect does not create an ambiguity as to the hearings and reviews of which foster parents must be notified and in which they must be afforded the opportunity to be heard. Rather, it is clear that the petition triggers these rights of foster parents without limiting them. Likewise, the adjudication triggers the right of qualified foster parents to intervene under section 19–3–507(5)(a) without limiting that right.

Nor am I persuaded that the statutory limitation on intervention as a matter of right to persons "who have information or knowledge concerning the care and protection of the child" creates an ambiguity. As a grammatical matter, that language, along with the language limiting intervention to those "who have the child in their care for more than three months," merely limits *who* may inter-

vene as a matter of right. A foster parent meeting those requirements may; a foster parent who does not may not. The General Assembly has made a judgment that foster parents meeting these requirements have a sufficient interest in, and sufficient knowledge of, the child's best interests to justify their participation as intervenors. The conditions precedent to intervention impose no limitation on an intervenor's participation.

The majority's conclusion that the statute is ambiguous because it does not expressly impose any temporal or substantive limitations on an intervenor's participation is also logically flawed. That reasoning presupposes that such limitations are necessary to render the statute's meaning clear. I perceive no lack of clarity in a statute which allows qualified foster parents to intervene as a matter of right following adjudication and thereafter to participate as parties in proceedings regarding a child. The fact the General Assembly could have imposed the kind of limitations the majority engrafts on the statute does not mean that it created an ambiguity by failing to do so.

And this gets to the heart of my disagreement with the majority on this issue. The section gives qualified foster parents[6] a right to "intervene," not merely to participate as witnesses. When one intervenes in a case as a matter of right, he becomes a party to the action, with all of the rights of a party. *See People v. Ham*, 734 P.2d 623, 625 (Colo.1987) ("Intervention is a procedural device whereby an outsider or stranger to litigation may enter the case as a party for the purpose of presenting a claim or defense."); *In re S.A.M.*, 321 S.W.3d 785, 789–90 (Tex.App. 2010) (applying this principle in an action affecting a parent-child relationship); *In re D.D.M.*, 116 S.W.3d 224, 231–32 (Tex.App. 2003) (applying this principle to recognize validity of foster parents-intervenors' motion to terminate parental rights); *Brook v. Brook*, 865 S.W.2d 166, 172 (Tex.App.1993) (applying this principle and holding that intervenors could call witnesses in a proceeding to determine child's custody), *aff'd*, 881 S.W.2d 297 (Tex.1994); *In re Dependency of J.W.H.*, 147 Wash.2d 687, 57 P.3d 266, 271–72 (2002) (as intervenors of right with party status, custodial aunt and uncle had right to present evidence in dependency proceeding); *In re Custody of C.C.M.*, 149 Wash.App. 184, 202 P.3d 971, 978 (2009) ("[A]n intervening party has the right to participate in the principal action to the same extent as the original parties."); *Capshaw v. Osbon*, 190 P.3d 156, 159 (Wyo.2008); *see generally* 7C Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1920 (3d ed.2007) (discussing distinctions between intervenors as a matter of right and permissive intervenors). We must presume the General Assembly understood the legal import of the terms it used. *Granite State Ins. Co. v. Ken Caryl Ranch Master Ass'n*, 183 P.3d 563, 567 (Colo.2008); *Allely*, 124 P.3d at 913.

The majority apparently recognizes that section 19–3–507(5)(a) allows foster parents to participate as parties—with the rights to introduce evidence, call witnesses, cross-examine witnesses, and advocate for a particular result—at the dispositional hearing, but concludes that it only allows them to participate as witnesses in subsequent hearings. This amounts to construing the word "intervene" in the statute one way for purposes of the dispositional hearing and another, more limited way for other purposes. There is no textual support for such differing treatment. Nor, as indicated above, is there any ambiguity in the statute permitting such a construction. And finally, the majority cites no authority for the proposition that an intervenor of right may be regarded as a mere witness.

That the General Assembly knew the difference between witnesses and intervenors is apparent from the fact section 19–3–502(7) already gives all foster parents the rights to notice and to "be heard" in "all hearings and reviews held regarding a child." Therefore, the General Assembly must have intended to grant greater rights to qualified foster parents under section 19–3–507(5)(a).[7] To hold

---

6. Not every foster parent may intervene as a matter of right under section 19–3–507(5)(a). Only those who have had a child in their care for more than three months and have information or knowledge concerning the care and protection of the child may do so.

7. Section 19–3–502(7) also says that a foster parent "shall not be made a party to the action for

otherwise, as the majority does, is to render the statute largely, if not entirely, superfluous. Indeed, the majority acknowledges that its interpretation of section 19–3–507(5)(a) means the rights granted by that provision and those granted by section 19–3–502(7) are "overlapping." Where possible, however, we are to avoid interpreting a statute so as to render any part of it meaningless or superfluous. *Spahmer v. Gullette*, 113 P.3d 158, 162 (Colo.2005).

The majority's analysis also results in conflicting interpretations of subsection 5(a) of section 19–3–507 and subsections 5(b) and 5(c) of the same statute. Subsections 5(b) and 5(c) require that foster parents (among others) be given notice of "any administrative review of the child's case" and "of a court hearing for the child's case," respectively. These subsections, particularly subsection 5(c), would appear to unambiguously require that foster parents be given notice of all court hearings, notwithstanding that the subsections are in a statute labeled "Dispositional hearing." The majority offers no logical explanation why the General Assembly would have intended subsection 5(a) to apply only to dispositional hearings, but have intended the other subsections, 5(b) and 5(c), to apply to all proceedings involving the child's case. Again, there is no textual support for such differing treatment.

The majority's analysis also fails to account fully for section 19–3–508(1), C.R.S.2010. That provision expressly contemplates that the proposed disposition at a dispositional hearing may be "termination of the parent-child legal relationship." Under the majority's interpretation of section 19–3–507(5)(a), however, intervening foster parents could not participate at such a dispositional hearing other than as witnesses. But section 19–3–507(5)(a) draws no distinction between dispositional hearings at which intervening foster parents have party status and those at which they may participate merely as witnesses.

The majority relies heavily on the division's decision in *People in Interest of*

*A.W.R.*, 17 P.3d 192 (Colo.App.2000). In that case, the division held the district court did not abuse its discretion in restricting an intervenor's participation in a permanency planning hearing. *Id.* at 197.

In my view, *People in Interest of A.W.R.* was wrongly decided. Section 19–3–702(1), C.R.S.2010, provides that "any party" may request a permanency planning hearing following a dispositional hearing. As discussed above, an intervenor is a party. *See People in Interest of D.C.*, 851 P.2d 291, 293 (Colo. App.1993) (recognizing the right of intervening foster parents to file a motion for a permanency planning hearing under section 19–3–702). If an intervenor may request a permanency planning hearing, it follows that the intervenor may fully participate in such a hearing.

The division in *People in Interest of A.W.R.* did not analyze the language of section 19–3–507(5)(a) (then codified at § 19–3–507(5), C.R.S.2000) or of section 19–3–702 (which governs permanency planning proceedings and provides that a motion for a permanency planning hearing may be filed by "any party"). Nor did it address what it means to be an intervenor. Instead, it merely weighed what it perceived to be the relative interests of the parties at a permanency planning hearing. 17 P.3d at 197. To be sure, if the court perceives some ambiguity in statutory language, the type of analysis engaged in by the division in *People in Interest of A.W.R.* may be helpful in construing a statute. But dispensing entirely with any analysis of the statutory language is not, in my view, appropriate.

The majority states, however, that because *People in Interest of A. W.R.* was decided before the 2004 amendments to section 19–3–507, the General Assembly must have approved of that case's application of section 19–3–507(5)(a). I disagree, for two reasons.

First, the rule that the legislature is presumed to know of prior law, and to approve of it when it does not change language so as to counter prior law, applies when the legisla-

---

purposes of any hearings or reviews *solely* on the basis of [being entitled to] notice and [the] right to be heard." (Emphasis added.) This implies that a foster parent may be made "a party to the

action" if other circumstances are present. Section 19–3–507(5)(a) would appear to define those circumstances.

ture addresses or amends the *subject* of the prior law. *See Vaughan v. McMinn*, 945 P.2d 404, 408–09 (Colo.1997); *People in Interest of E.E.A. v. J.M.*, 854 P.2d 1346, 1349 (Colo.App.1992). The General Assembly did not address the subject of section 19–3–507(5)(a) in 2004. Instead, it merely added two provisions requiring notice to foster parents (and others) of hearings and reviews regarding a child. *See* § 19–3–507(5)(b), (c), C.R.S.2010.

Second, by adding subsections (5)(b) and (5)(c) in 2004, the General Assembly indicated that it was *not* aware of existing law. That is because, as the majority recognizes, section 19–3–502(7) already required that notice of all hearings and reviews be provided to the persons identified in the newly enacted subsections of section 19–3–507. Under these circumstances, it is too much of a stretch to divine any legislative approval of the division's decision in *People in Interest of A.W.R.* by virtue of the 2004 amendments.

In sum, I read section 19–3–507(5)(a) as unambiguously conferring on qualifying foster parents party status should they intervene following an adjudication. As parties, foster parents here had the right to present evidence, call witnesses, cross-examine witnesses, and advocate for a particular result. I would enforce the statute as written. The majority engrafts limitations on the foster parents' participation that are not found in or suggested by the clear statutory text. *See Colo. Dep't of Revenue v. Hibbs*, 122 P.3d 999, 1004 (Colo.2005) (court would not interpret a statutory term in a sense narrower than its plain and ordinary meaning); *Spahmer*, 113 P.3d at 162 ("We will not create an addition to a statute that the plain language does not suggest or demand."); *Dawson v. PERA*, 664 P.2d 702, 707 (Colo.1983) ("When the meaning of a statute is plain and unambiguous, a court cannot substitute its opinion as to how the law should read in place of the law already enacted.").

## II. Extrinsic Evidence of Legislative Intent

Though I perceive no ambiguity in section 19–3–507(5)(a), and therefore no need to look to extrinsic evidence of the General Assembly's intended meaning of that provision, I take issue with the majority's analysis of the extrinsic evidence.

The provision apparently had its genesis in the Colorado Foster Parent Rights and Responsibilities Task Force. The General Assembly created that task force to study and make recommendations concerning a number of principles. As relevant here, those principles included "the right [of foster parents] to be named as an interested party for *any court proceeding involving the child*" and "the responsibility [of foster parents] to advocate for children in obtaining needed services and protection." Ch. 236, sec. 1, § 19–3–209(2)(*o* ), (u), 1993 Colo. Sess. Laws 1246 (emphasis added; subsequently codified at § 19–3–210; repealed Aug. 7, 1996).

The task force's Final Report contained many recommendations, one of which was that legislation be enacted "to establish the right of present foster parents to be regarded as parties in court...." The task force noted that such a right would allow foster parents "equal participation, representation and input." There is nothing in the report indicating, either expressly or by implication, that this right to be a party entitled to "equal participation" would be limited to dispositional hearings. The report, which is eighteen pages long, does not even mention dispositional hearings. And the Summary of the Final Report refers generally to foster parents' right to participate in "court hearings."

After mentioning this stated intent to provide foster parents with the right to "equal participation," the majority concludes that foster parents are not entitled to equal participation. In so doing, the majority seizes on the task force's comment that giving foster parents party status would "support[ ] the team concept and a non-adversarial approach." It is far from clear what the task force meant by this,[8] but given the context, I

---

**8.** Indeed, one member of the task force, commenting on the final report, expressed the opinion that "[g]iving foster parents the status of a party also increases the adversarial nature of the process." Colorado Foster Parent Rights and Responsibilities Task Force, Addendum, Summary of the Task Force Feedback on Final Recommendations, at 17 (comment of Kittie Arnold).

think it illogical to extrapolate from the comment an intent that foster parents not have a right of "equal participation" in termination hearings.[9]

### III.  Parents' Liberty Interest

The majority also concludes that allowing foster parents to fully participate in a termination hearing infringed on the parents' constitutional liberty interest in the parent-child relationship.  I cannot agree.

It is unclear to me precisely what the majority perceives the constitutional violation to be.  The majority spends much time discussing whether foster parents have a constitutional liberty interest at stake in a termination hearing, and concludes that they do not.  But the district court did not find that foster parents had such an interest and no party argues the existence of such an interest on appeal.  Perhaps more importantly, whether foster parents have such an interest says little if anything about whether their participation infringed on the parents' constitutional interest.  Assuming foster parents here do not have such an interest, the question remains whether allowing them to fully participate (as I believe section 19–3–507(5)(a) does) somehow infringed on parents' rights.

As best I can tell, the majority concludes that allowing foster parents here to advocate for the termination of parents' parental rights (as foster parents' counsel did in argument to the court) violated the parents' rights.  This misperceives the extent of the parents' rights.

The parents have a liberty interest.  A person may be deprived of liberty if afforded due process of law.  U.S. Const. amends. V ("No person shall ... be deprived of ... liberty ... without due process of law...."), XIV. This principle applies to a parent's liberty interest in the parent-child relationship. *See Lassiter v. Dep't of Social Services*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640

(1981);  *L.L. v. People*, 10 P.3d 1271, 1275–76 (Colo.2000);  *B.B. v. People*, 785 P.2d 132, 136 (Colo.1990);  *People in Interest of E.A.*, 638 P.2d 278, 283 (Colo.1981).

To satisfy the due process requirement, a parent's interest in the parent-child relationship must be protected " 'with fundamentally fair procedures' " when termination of that relationship is sought.  *L.L.*, 10 P.3d at 1276 (quoting *Santosky v. Kramer*, 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).  Thus far, the courts have held that the requirement of due process is satisfied in this context if (1) a parent is provided adequate notice of the proceeding and a full opportunity to be heard and offer relevant evidence, and (2) the statutory requirements for termination are proved by clear and convincing evidence.  *See Santosky*, 455 U.S. at 769, 102 S.Ct. 1388;  *People in Interest of A.M.D.*, 648 P.2d 625, 631 (Colo.1982);  *People in Interest of E.A.*, 638 P.2d at 283;  *Johnson v. People in Interest of W–J–*, 170 Colo. 137, 144–45, 459 P.2d 579, 582 (1969).  Here, parents were afforded these protections.

I see no basis, and the majority cites none, for holding that a parent's right to due process is violated if a foster parent expresses the opinion at a termination proceeding that termination is in the child's best interests.  The mere expression of such opinion in no way infringes on the parent's ability to be heard, present evidence, or challenge evidence presented by other parties.  Nor does it impact the burden of proof.

And it must be remembered that in determining whether to terminate a parent-child relationship, the court must "give primary consideration to the physical, mental, and emotional conditions and needs of the child," § 19–3–604(3), C.R.S.2010—that is, it must examine the child's best interests.  *People in Interest of A.G.*, 264 P.3d 615, 621 (Colo.App. 2010);  *People in Interest of C.H.*, 166 P.3d 288, 289 (Colo.App.2007).  Because of the frequency and intensity of their interactions with a child, and their opportunity to observe

---

**9.**  It seems much more likely to me that the task force meant that giving foster parents party status would eliminate disputes over whether they should be allowed to participate and would permit the input of another voice in determining the child's best interests.  *See* Colorado Foster Parent Rights and Responsibilities Task Force, Final Report, Recommendation No. 11, at 12 (1995) (stating that giving foster parents party status would "provide[ ] another voice for the child" and "provide[ ] valuable information about the child from someone who knows him/her well").

interactions between the parents and the child as well as the effects of those interactions on the child, foster parents will often be in a unique position not only to possess information relevant to examining a child's best interests, but also to form an opinion as to whether termination is in a child's best interests. *See People in Interest of M.D.C.M.*, 34 Colo.App. 91, 94, 522 P.2d 1234, 1236–37 (1974) (recognizing that persons with custody of a child, such as foster parents, "can materially aid the court in its determination of what in fact is in the child's best interest").[10] In any event, an opinion is only that, and the court must make its determination of whether termination is appropriate in light of the statutory factors, not who or how many persons advocate for termination.

To the extent the majority concludes that parents' rights were violated by foster parents' cross-examination of witnesses at the hearing, I disagree. The majority does not assert that the cross-examination elicited irrelevant, unfairly prejudicial, or otherwise inadmissible evidence. The majority does not even identify the offending evidence with any specificity. It says merely that the subject evidence included "detrimental information concerning mother's and father's domestic violence issues and their attentiveness to treating the child's medical problems," matters highly relevant to whether parental rights should be terminated. I fail to see how eliciting such relevant, admissible evidence violates the due process rights of any party. The right to due process does not include the right to be the gatekeeper of "detrimental" evidence.

Further, the majority would apparently concede that had the foster parents' counsel's questions on cross-examination come instead from the GAL's mouth there would be no constitutional concern. I do not see, and the majority does not explain, how the identity of the questioner affects the constitutional analysis in this context.

In sum, I perceive no constitutional prohibition against foster parents' full participation in the termination proceeding.[11]

## IV. The District Court's Reasons for Termination

The majority opines that "at every turn, the foster parents attempted to portray mother and father as bad parents and themselves, by implication, as good parents and the best possible choice for permanent placement for the child." In concluding that the foster parents' advocacy "substantially influence[d] the termination order," the majority necessarily implies that the district court was swayed by this supposed comparison. But foster parents simply presented evidence showing that parents were not good parents. Given the issues in play at the termination hearing, how doing so was in any way improper escapes me. More importantly, though foster parents' counsel argued that it would be detrimental to A.M. to remove her from foster parents' custody, there is no indication in the record whatever that the district court viewed the proceeding as one to determine whether A.M. would be better off with parents or foster parents. To the contrary, the record shows the district court understood and strictly applied the statutory termination criteria.

## V. Sufficiency of the Evidence

The majority concedes that the evidence presented at the termination hearing was conflicting. And, by remanding for a new hearing rather than for entry of judgment in mother's favor, it implicitly concedes that the evidence was sufficient to support the district court's conclusion that termination was appropriate as to mother. I agree that the evidence was sufficient. It is also clear from the district court's written order that it considered all of the evidence presented. Therefore, I would simply affirm the judg-

10. As discussed above, the task force report which ultimately led to the enactment of section 19–3–507(5)(a) expressly recognized that the nature of foster parents' interaction with a child makes them qualified to speak for the child.

11. I observe that the majority's analysis would require a conclusion that section 19–3–507(5)(a) is unconstitutional if, as I believe, it permits qualified foster parents to participate fully at a termination proceeding. For the foregoing reasons, I would not support such a conclusion.

ment terminating mother's parental rights as to A.M. *See People in Interest of A.J.L.,* 243 P.3d 244, —— (Colo.2010) (the trial court's findings on the issue of termination of parental rights must be upheld on appeal unless they are " 'so clearly erroneous as to find no support in the record' "; quoting *People in Interest of C.A.K.,* 652 P.2d 603, 613 (Colo. 1982)); *People in Interest of M.S.H.,* 656 P.2d 1294, 1297 (Colo.1983) (where evidence pertaining to termination of parental rights is conflicting, "it is the trial court's province to judge the credibility of the witnesses, the sufficiency, probative effect and weight of the evidence, and the inferences and conclusions to be drawn from the evidence").[12]

## VI. Conclusion

I concur in the majority's decision to affirm the judgment as to father, not because any error as to father was harmless, but because, perceiving no error, I conclude that the district court's findings have record support. I also concur in the majority's conclusion that the district court was not (and is not) required to give more weight to the most recent reports and evaluations. In all other respects, I respectfully dissent from the majority's opinion. I would likewise affirm the judgment as to mother.

---

**12.** For the same reason, I would affirm the judgment terminating father's parental rights. Given my view of the propriety of foster parents' partic-ipation, I do not need to resort to a harmless error analysis, as does the majority.